UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60459-CIV-ALTMAN/Hunt

THOMAS MACHINERY, INC.,

    *Plaintiff,*

*v.*

EVEREST NATIONAL
INSURANCE COMPANY, *et al.,*

    *Defendants.*

_____/

## ORDER

The Defendant, Everest National Insurance Company, issued a general commercial liability policy (the "Policy") to the Plaintiff, Thomas Machinery, a repair shop for concrete pumps and parts. A third party—Ainsworth International—sued Thomas after Ainsworth's concrete pump truck (the "Truck") was stolen from an unspecified spot in front of Thomas's warehouse. Thomas tendered the defense to Everest, which denied coverage. Although Thomas eventually settled Ainsworth's claims, it incurred some $200,000 in litigation costs. Arguing that these costs were the foreseeable consequence of Everest's refusal to defend Thomas against the Ainsworth suit, Thomas sued Everest in state court, alleging a breach of the insurance contract. Everest removed the case, and the parties have now filed cross-motions for summary judgment on one issue: whether Everest had a duty to defend Thomas against Ainsworth's lawsuit.

After careful review, we conclude that Everest *did* have a duty to defend. The theft of the Truck constituted "property damage" under the Policy, and Everest never expressly *excluded* theft from coverage, as it would have been required to do under Florida law. Nor was Everest justified in invoking several Policy exclusions. The first exclusion applies if (1) the property didn't suffer "physical injury" and (2) the property damage "arose out of" the insured's "delay or failure . . . to perform" the terms

of a contract. Everest has failed to show that Ainsworth's allegations foreclosed *any* inference that the Truck was physically injured. To the contrary, it's easy to imagine a situation in which, for example, the thief broke into the Truck and hotwired the ignition, causing at least *some* physical damage. In any event, Everest can't show that the theft "arose out of" Thomas's failure to carry out its contractual obligations because Ainsworth's complaint—by which we are, at this stage, constrained—offers no specifics about any verbal agreement with Thomas.

The second exclusion is a bit trickier. It precludes coverage for any damage to property that's within Thomas's "care, custody or control." Courts around the country—including in Florida—have had some difficulty construing (and applying) this odd and overly-technical provision. But, whatever its contours, Everest again fails to show that *no* reasonable interpretation of the complaint pushes Ainsworth's underlying claims beyond the scope of the exclusion. Everest, to be sure, offers *one* reasonable reading that *would* trigger this exclusion—*viz.*, that the Truck was stolen only *after* Thomas accepted delivery and exerted control over it. But there are *other* plausible readings. And Ainsworth's allegations—cryptic as they are—leave several of these open: for instance, that Thomas didn't know the Truck had been delivered; that, even if it knew, it didn't accept the delivery; or that, by the time the Truck was purloined, Thomas had completed the repairs and had tried to return it to Ainsworth.

Notably, each of these possibilities—unlike Everest's interpretation—fits neatly into the legal theories Ainsworth advanced in the state-court complaint. That's because, in Count II of that complaint, Ainsworth asserted a claim of "negligent bailment," which (it goes without saying) would subsume Everest's version of events—the version that characterizes Thomas as a repair-shop bailee as soon as it knowingly accepted delivery of the Truck. In Count I, however, Ainsworth alleged that Thomas had breached some separate "duty to safeguard." Since Ainsworth had already claimed (in Count II) that Thomas became a repair-shop bailee, this first count would have been entirely superfluous if Everest's were the only acceptable version of events. After all, once Thomas knowingly

accepted delivery of the Truck, it became a bailee—precisely what Ainsworth had already alleged in Count II. Count I, in other words, must be saying something different than Count II. What exactly? Well, one (or more) of the three scenarios we've outlined above. In any of those three scenarios, Thomas *wouldn't* have become a bailee because it *wouldn't* have been in possession or control of the Truck. These three scenarios, in sum, plausibly explain—in a way that Everest's interpretation does not—the presence of Ainsworth's Count I. And, of course, if Thomas *didn't* have possession or control of the Truck when it was stolen, then the Truck wasn't in Thomas's care, custody, or control. Since each of these three scenarios would push Ainsworth's complaint beyond the ambit of Everest's exclusion, Everest had a duty to defend the whole case.

As this summation makes plain, we **GRANT** the Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ")[1] [ECF No. 48] and **DENY** the Defendant's Motion for Summary Judgment ("Def.'s MSJ")[2] [ECF No. 56].

**BACKGROUND**

## I.      The Underlying Complaint: *Ainsworth v. Thomas*

In the Underlying Complaint [ECF No. 47-2], Ainsworth alleged that it had entered into a verbal agreement with Thomas to fix the Truck. *See id.* ¶ 4. Ainsworth claimed that "the concrete pump . . . was delivered to [Thomas's] Tampa area business facility," but, "[u]nbeknownst to Ainsworth . . . the concrete pump was left by [Thomas] on a street outside of Thomas's business facility, and unsecured." *Id.* ¶¶ 4–5. When Ainsworth called Thomas about the repair, "Ainsworth was informed that its concrete pump had been stolen the prior evening." *Id.* ¶ 6.

---

[1] The document's formal name is the Plaintiff's "Renewed Motion for Partial Summary Judgment to Determine the Duty to Defend."

[2] The Defendant has called this motion the "Defendant Everest National Insurance Company's Combined Response to Plaintiff's Renewed Motion for Partial Summary Judgment on the Duty to Defend and Cross-Motion for Summary Judgment on Count I of Plaintiff's Amended Complaint."

3

Ainsworth advanced two causes of action in the Underlying Complaint—negligence and negligent bailment.[3] In Count I—the negligence claim—Ainsworth's legal theory was that Thomas "breached its duty to [Ainsworth] to safeguard [Ainsworth's] concrete pump." *Id.* ¶ 10. Ainsworth's Count II—negligent bailment—turned on the allegation that, although Thomas "had sole, actual and exclusive possession and control of Ainsworth's concrete pump prior to the theft," it "failed to return the concrete pump to Ainsworth" and "failed to exercise ordinary care in its storage of the concrete pump by failing to store the pump within its secure facility or otherwise securing the concrete pump to prevent theft[.]" *Id.* ¶¶ 14, 16.

## II.     The Policy

The Policy Everest issued to Thomas covers claims for "'property damage' to which this insurance applies" and imposes on Everest a "duty to defend [Thomas] against any 'suit' seeking those damages." Policy [ECF No. 47-1] § I.1(a). The Policy defines "property damage" as (a) "[p]hysical injury to tangible property," *or* (b) the "[l]oss of use to tangible property that is not physically injured." *Id.* § V.17. The Policy has two relevant exclusions:

1. The "CCC Exclusion": Excluding coverage for "property damage" to "[p]ersonal property in the care, custody or control of the insured." *Id.* § I.2(j)(4).

2. "Exclusion M": Excluding coverage for "'property damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." *Id.* § I.2(m). Exclusion M "does not apply to the loss of use of other property arising out

---

[3] Ainsworth originally asserted only a claim of negligent bailment, which was premised on the Truck's having been in Thomas's care, custody, and control when it was taken. *See* Amended Complaint [ECF No. 47] ¶ 12. When Thomas tendered that original complaint, however, Everest refused to defend Thomas against it, relying (as here) on the Policy's "care, custody or control" exclusion. *See id.* ¶¶ 12–13. Later, Ainsworth filed a second amended complaint—what we've called the Underlying Complaint—in which it added the broader negligence claim. *See id.*

of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." *Id.*

## III.   Procedural History

We denied *without prejudice* the first round of cross-motions on the duty to defend, *see* Order [ECF No. 44], after concluding that the parties had failed to address several potentially dispositive issues, *see* Mar. 3, 2021 Hr'g [ECF No. 43]. The parties have since filed renewed motions, which are now ripe for review.[4] In those motions, Thomas contends that Ainsworth's *negligence* claim (Count I) triggered Everest's duty to defend—even as it concedes that Count II (Ainsworth's negligent-bailment claim) did not.[5]

## THE LAW

Under Florida law,[6] the insurer's duty to defend is triggered when the underlying complaint against its insured "fairly brings the case within the scope of coverage." *Princeton Excess & Surplus Lines Ins. Co. v. Hub City Enters., Inc.*, 808 F. App'x 705, 708 (11th Cir. 2020) (cleaned up). "If there is any

---

[4] *See* Pl's MSJ; Def.'s MSJ; Plaintiff's Combined Reply Memorandum of Law in Support of Renewed Motion for Summary Judgment and Response in Opposition to Defendant's Combined Cross Motion for Summary Judgment and Response ("Pl.'s Reply MSJ") [ECF No. 59]; Everest's Reply in Support of Everest's Cross-Motion for Summary Judgment ("Def.'s Reply MSJ") [ECF No. 66]; Plaintiff's Sur-Reply to Defendant Everest's Reply in Support of Everest's Cross-Motion for Summary Judgment ("Pl.'s Sur-Reply MSJ") [ECF No. 67].

[5] *See* Pl.'s MSJ at 14–15 ("[W]hile Count II, which is a bailment count, must include the element of care, custody, or control, the negligence [count] does not and thereby gives rise to a legal theory where there is coverage and which does not fit squarely within the CCC Exclusion."); Pl.'s Reply MSJ at 3–4 ("[T]he reasonable interpretation here is that under Count I, Ainsworth does not allege Thomas had possession and/or control of the Truck prior to the theft and therefore did not accept delivery or rejected delivery of the Truck."); Pl.'s Sur-Reply MSJ at 2 ("[W]hile Count II may facially trigger the CCC Exclusion, Count I seeks to hold Thomas liable for *not* exercising care, custody, or control over the truck—which is why Everest was responsible for providing Thomas a defense."); *cf.* Amended Complaint ¶ 25 (noting that the underlying settlement agreement between Thomas and Ainsworth encompassed only Count I of the Underlying Complaint).

[6] The parties agree that Florida law governs this diversity action. *See generally* Pl.'s MSJ (citing Florida law); *see also* Def.'s MSJ (same). Nor could they *really* have argued otherwise. *See Orlando Nightclub Enters., Inc. v. James River Ins. Co.*, 2007 WL 4247875, at *3 (M.D. Fla. Nov. 30, 2007) ("In a diversity action, the federal court must apply the substantive law of the forum state in which it sits. Because the parties have agreed that Florida law governs the instant dispute, the Court will apply Florida law to interpret the contract without conducting its own choice of law analysis." (cleaned up)).

doubt about the insurer's duty to defend, then the ambiguity must be resolved in favor of the insured." *Id.*; *see also Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323 (11th Cir. 2014) ("The duty to defend arises if the relevant pleadings allege facts that fairly and potentially bring the suit within policy coverage." (cleaned up)). "If the [underlying] complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *MJCM, Inc. v. Hartford Cas. Ins. Co.*, 2010 WL 1949585, at *4 (M.D. Fla. May 14, 2010) (citing *Battisti v. Continental Cas. Co.*, 406 F.2d 1318, 1321 (5th Cir. 1969)).

When the allegations in the underlying complaint "show either that a policy exclusion applies or that no coverage exists, no duty to defend arises." *Kenneth Cole Prods., Inc. v. Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1331, 1334 (S.D. Fla. 2010) (Jordan, J.) (citing *Fed. Ins. v. Applestein*, 377 So. 2d 229, 232 (Fla. 3d DCA 1979)). But, when an insurer relies on a policy exclusion to deny coverage, "it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006). While ambiguous policy language is construed against the drafter and in favor of the insured, "exclusionary clauses are construed even more strictly against the insurer than coverage clauses." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Any doubt regarding the duty to defend is resolved in favor of the insured. *See Miranda Constr. Dev., Inc. v. Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1336, 1339 (S.D. Fla. 2010) (Graham, J.).

## ANALYSIS

The cross-motions for summary judgment raise three questions. *First*, was there affirmative coverage under the Policy? *Second*, did Exclusion M bar coverage? *Third*, did the CCC Exclusion bar coverage?[7] We address each question in turn.

---

[7] In its motion for summary judgment, Thomas preemptively argued that a third exclusion—which Everest had invoked in an earlier round of briefing—didn't preclude coverage. *See* Pl.'s MSJ at 17–18 (citing Policy § I.2(j)(6)). By not responding to Thomas's argument or invoking this third exclusion in

## I.      Coverage

In Thomas's view, the Policy covered the theft because, under Florida law, theft qualifies as "property damage." Pl.'s MSJ at 4. Everest disagrees and insists that Florida's courts haven't yet "settled" this question. *See* Def.'s MSJ at 4. But Florida courts *have* held that theft constitutes "property damage" in similar insurance contracts—*unless* the parties express something different. And, as we'll see, the parties in our case haven't excluded theft from their definition of "property damage."

In *Travelers Insurance Co. v. De Bothuri*, 465 So. 2d 662 (Fla. 4th DCA 1985)—one of the seminal cases on this question—a woman whose property was stolen sued the insured for negligence, *id.* at 662–63. In a declaratory-judgment action by the insurer against the insured, the trial court entered judgment for the insured, holding that the theft of the woman's property *was* covered by the insurance contract, which—like our Policy—defined "property damage" as either "physical injury" *or* "loss of use of tangible property." *Id.* at 663. The Fourth District Court of Appeal affirmed. *Id.*

Everest reads the Fourth DCA's opinion in *De Bothuri* as not squarely resolving the issue—mainly because, in Everest's view, the parties "agreed" that the policy covered theft. *See* Def.'s MSJ at 4. We disagree. "At oral argument," the Fourth DCA said, "both parties agreed that the coverage for the theft *arises only out* of the second definition of property damage, to-wit: . . . loss of use." *De Bothuri*, 465 So. 2d at 663 (emphasis added). "[W]ith that clarification," the DCA affirmed the trial court, citing an earlier case that dealt with a similar insurance issue. *Id.* (citing *United States Fid. & Guar. Co. v. Mayor's Jewelers of Pompano, Inc.*, 384 So. 2d 256 (Fla. 4th DCA 1980)). The insurer, in other words, stipulated that "loss of use" was the *only* type of "property damage" at issue on appeal—*i.e.*, the only prong under which coverage *could* "arise"—and, therefore, agreed that the theft wasn't a "physical injury." But that's

---

its renewed motion, *see generally* Def.'s MSJ; Def.'s Reply MSJ, Everest has waived any reliance on it, *see In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

not the same thing as agreeing that the theft qualified as "loss of use"—and there's nothing in the opinion to suggest that the insurer ever stipulated to *that*.

Nor would it have made any sense for the insurer to appeal the summary-judgment order and then, once on appeal, to concede the issue. Indeed, if the insurer had (as Everest suggests) stipulated to losing the case, the DCA probably wouldn't have needed a substantive citation to *Mayor's Jewelers*— which, as we'll see in a moment, analyzed the scope of the phrase "property damage." The better reading of *De Bothuri*, in sum, is that it affirmed (in holding) the trial court's determination that, when it comes to commercial liability policies, theft equals "loss of use." And we're not the only ones who've interpreted the opinion in this way. *See* 31 FLA. JUR. 2D INSURANCE § 2499 (Sept. 2021 Update) (citing *De Bothuri* as holding that "[a]n insurance policy that covers the loss of use of tangible property that has not been physically injured or destroyed covers a loss by theft"); 9 COUCH ON INSURANCE § 126:39 (June 2021 Update) (citing *De Bothuri* for the proposition that "the loss of use of personal property which was stolen due to insured's negligence" constitutes a "loss of use" under a commercial liability policy); *cf. Old Dominion Ins., Co. v. Stellar Concepts & Design, Inc.*, 2014 WL 12835638, at *3 (Fla. Cir. Ct. Oct. 29, 2014) (citing *De Bothuri* for the view that "Florida courts recognize a loss of use without corresponding physical injury to tangible property").[8]

But here's the rub: Everest would lose this issue, even if it were right about *De Bothuri*, because the case on which *De Bothuri* relied—*Mayor's Jewelers*—unambiguously resolved this issue in a way that redounds to Thomas's benefit. Everest tries to cast *Mayor's Jewelers* aside by arguing that the policy in

---

[8]     Everest seems to believe that *Westfield Insurance Co. v. Eagle Electric, Inc.*, 2017 WL 3219666 (M.D. Fla. July 28, 2017), supports its reading. Not so. *Westfield* noted that the parties in *De Bothuri* "agreed that the stolen personal property . . . was covered *only by the second part of the definition* [of property damage]," *id.* at *2 (emphasis added). But that's perfectly consistent with our view of *De Bothuri*. *Westfield* didn't treat *De Bothuri* as a non-binding decision with a stipulated outcome, as Everest seems to suggest that it did. *Westfield*, rather, recognized—as we do—that the stipulation was only as to one of the two coverage prongs. And it went on to say that "it [was] bound to apply existing Florida law," which dictated that "theft must be considered property damage unless the insurance policy clearly expresses a contrary intent." *Id. Westfield*, in other words, supports Thomas here.

that case "did not involve a similar definition of 'property damage.'" Def.'s MSJ at 4. And that's true to some extent—though not in a way that helps Everest. In *Mayor's Jewelers*, the policy defined "property damage" *only* as "injury to or destruction of tangible property." *Mayor's Jewelers*, 384 So. 2d at 257. But—unlike the policies at issue here and in *De Bothuri*—the *Mayor's Jewelers* policy didn't have an alternative definition for "loss of use." *Id.* In other words, although the policy's definition of "property damage" was *narrower* in *Mayor's Jewelers* than it is here, the court *still* held that the theft counted as "property damage." *Id.* at 258. This was true, the court said, even though the stolen property wasn't "physically damaged," because the theft had "rendered [it] totally useless" and because its value had "totally diminished." *Id.* Stretching the contract language a bit, the court announced a broader principle: that "theft of personal property is 'property damage' *unless a contrary intent is clearly expressed.*" *Id.* (emphasis added). Applying that principle here, we have little difficulty concluding that Everest—a sophisticated party that drafts thousands of insurance contracts—should have, consistent with *Mayor's Jewelers*, issued a policy that expressly excluded theft from the definition of "property damage." But it didn't. *See* Policy § V.17. Instead, it used the *broader* definition of "physical damage"— the same definition that (according to *De Bothuri*) comfortably included theft.[9]

One more thing: Even if Florida law *weren't* settled on the meaning of "property damage," we'd still have to construe the plain text of the Policy. *See Swire Pac. Holding, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003) ("[I]nsurance contracts must be construed in accordance with the plain language of the policy."). And that text plainly supports Thomas's reading here. As we've said, the Policy covers claims for "property damage," including both "physical injury" and the "[l]oss of use to

---

[9] It's true, as Everest points out, that some states interpret the phrase "property damage" as *excluding* theft. *See* Def.'s MSJ at 5 (collecting cases). But Florida law is (notably) *not* one of these. It's thus unsurprising that the court rejected this very same argument in *Westfield*. *See* 2017 WL 3219666, at *2 ("[The insurer] argues that stolen property does not constitute property damage. However, it bases its argument primarily on cases from other jurisdictions, which are not binding on this Court. As discussed below, the relevant Florida case law does not support this proposition.").

tangible property that is not physically injured." Policy § V.17. When the Truck was stolen, Ainsworth lost the ability to use it—and that's really the end of that. In other words, absent an applicable exclusion, Everest had a duty to defend Thomas against Ainsworth's lawsuit.

## II.     The Policy Exclusions

### A.     Exclusion M

To prevail under Exclusion M, Everest must establish: (1) "'property damage' to . . . property that has not been physically injured," *and* (2) "property damage" that arose from "[a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." *Id.* § I.2(m) & (m)(2); *see* Pl.'s MSJ at 15–17; Def.'s MSJ at 18–20.[10] Exclusion M also comes with its own exception: it "does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." *Id.* Although the parties dispute the application of this exception—*see* Pl.'s MSJ at 16–17; Def.'s MSJ at 20—we won't reach that question here because, as we explain below, Everest has failed to show that the exclusion applies.

Everest first says that Exclusion M bars coverage *both* because the Underlying Complaint didn't allege physical injury to the Truck *and* because no such injury can be "inferred." Def.'s MSJ at 18–20. Everest is right on the first point but wrong on the second. Ainsworth, recall, claimed that the Truck was stolen in a high-crime area. *See* Underlying Complaint ¶¶ 4–5. It's thus not unreasonable to suppose that the thief picked the Truck's lock, smashed its windows, and then hot-wired its ignition— all of which might well have damaged the Truck. It's *possible*, of course, that the thief somehow managed to take the Truck without causing damage. But there's nothing in the Underlying Complaint that *precludes* an alternative scenario in which the Truck was damaged. *See Beaver*, 466 F.3d at 1296 (to

---

[10] Everest doesn't suggest that the stolen Truck constituted "impaired property," nor does it argue that the theft arose from "[a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'" *See generally* Def.'s MSJ.

rely on an exclusion, an insurer must show "that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation"). And, even if we were to accept Everest's account of the theft, Thomas would still have a fairly compelling argument that the Truck was "physically damaged" in the sense that its value depreciated. As car owners know all too well, the value of a vehicle drops the moment it's driven off the lot. That's because, in the regular course of driving, cars experience wear-and-tear—knicks, scrapes, worn tires, engine deterioration, etc. In our view, it isn't a stretch to suggest that a stolen car—one that's been broken into and driven, probably at high speeds, by someone other than its owner—experiences these degradations in spades. Everest, in short, has failed to show that Ainsworth's allegations *preclude* a finding that the Truck suffered some physical damage.

Everest cites two cases for its contention that the Truck *couldn't* have been "physically injured." It cites *Mayor's Jewelers* for the proposition that theft of jewelry doesn't constitute "property damage," Def.'s MSJ at 19—though it's not clear why that case is apposite here, since jewelry and concrete pump trucks are entirely different objects. Jewelry doesn't need to be "broken into" or hotwired to be stolen. To the contrary, for reasons having to do with maintaining the jewelry's resale value, the thief generally tries his best *not* to damage the jewelry. The concrete-pump-truck thief, by contrast, *must* break into the truck and hotwire it (unless he has the keys or a tow truck—possibilities Ainsworth omitted from its complaint). And, unlike jewels, vehicles tend to depreciate over time. In any event, the court in *Mayor's Jewelers* didn't address Exclusion M[11] and looked, instead, at the meaning of the phrase "property damage" to determine the separate question of whether the policy provided *affirmative*

---

[11] It did address an "exclusion (m)," but not the same one at issue here. *See Mayor's Jewelers*, 384 So. 2d at 258 (addressing exclusion (m) for "property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith").

coverage. *See Mayor's Jewelers*, 384 So. 2d at 258. For all these reasons, then, *Mayor's Jewelers* doesn't save Everest here.

Everest also relies on *Westfield*, where an insured installed a fuel system with faulty wiring, thereby allowing customers to steal fuel undetected. *See Westfield*, 2017 WL 3219666, at *2. In a subsequent lawsuit, the district court held that stolen fuel was "physically injured" for purposes of Exclusion M, reasoning that, "[u]nlike stolen jewelry or personal property, fuel is a consumable good," and adding that, "while there is no reason to assume that stolen jewelry or personal property has been physically injured, there is reason to think that the fuel has been." *Id.* Accordingly, the court held, "[a] jury could find that the individuals who took the fuel used that fuel after they stole it." *Id.*

Everest contends that, because the Truck isn't a "consumable good"—like fuel—we should read *Westfield* as suggesting that Exclusion M bars Thomas's claim in the circumstances of our case. *See* Def.'s MSJ at 19 (arguing that the "[u]se of the truck does not result in its consumption and destruction, as is the case with fuel"). But *Westfield* didn't say that *only* "consumable goods" suffer "property damage" during theft. The question in our case, moreover, isn't whether the Truck was "consumed" or "destroyed"—those two words don't appear in the Policy. The question, rather, is whether we can reasonably infer, from the Underlying Complaint, that the Truck was "physically injured." Since we've answered this question affirmatively, *Westfield* doesn't alter our conclusion.

Although the plausible inference that the Truck suffered physical damage is enough for us to conclude that Exclusion M doesn't apply here, we also find that Everest failed to establish the exclusion's second prong—*viz.*, that the property damage "[arose] out of" Thomas's "delay or failure . . . to perform a contract or agreement in accordance with its terms." Policy § I.2(m) & (m)(2). As Everest points out, Ainsworth alleged in the Underlying Complaint that it had a "verbal agreement" with Thomas. *See* Underlying Complaint ¶ 4. Critically, though, Ainsworth didn't describe *any* of the terms of that agreement; it didn't allege that the Truck was stolen *because* of Thomas's "delay or failure

. . . to perform" that agreement "in accordance with its terms"; and (perhaps most telling) it didn't

even assert a breach-of-contract claim. *See generally id.* And we can't simply assume that Thomas delayed

or failed to carry out any of its (as-yet-undisclosed) contractual obligations.

Still, Everest contends that the verbal agreement *must've* included an obligation to return the

Truck once the repairs were completed. *See* Def.'s MSJ at 19. We disagree—not so much with

Everest's conclusion as with its premise. It's not implausible to believe that Ainsworth agreed to pick

up the Truck by a certain date and that Thomas disclaimed any responsibility after that date. We, again,

know nothing about the parties' agreement. Even if we were to accept, though, that Thomas assumed

the obligation Everest has here foisted upon it, Everest hasn't shown that the obligation was *expressed*

in the agreement. And it points us to no authority for its view that Exclusion M is triggered by *either*

express *or* implied contract terms. Of course, even if we could assume that the parties *expressly* included

a "return" obligation in their oral agreement, we still don't know *when* Thomas promised to return the

Truck. We cannot say that the theft *arose from* some delay or failure to perform on *that* term. After

all, the thief may have stolen the Truck within the contract period, not because of Thomas's delay or

as a result of its failure to perform, but because of Thomas's negligence in protecting its warehouse—

a breach that's separate from (and unrelated to) its supposed contractual obligations.[12]

Everest reminds us that the Florida Supreme Court has interpreted the phrase "arising out of"

"expansively" to mean "'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,'

'incident to' or 'having a connection with.'" Def.'s MSJ at 19 (quoting *Taurus Holdings, Inc. v. U.S. Fid.

& Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005)). But we needn't speculate about the outer boundaries of

this (admittedly) elastic phrase. The point here is that the Underlying Complaint doesn't establish that

---

[12] Our case is, therefore, different than *Transcontinental Insurance Co. v. Ice Systems of America, Inc.*, 847 F. Supp. 947 (M.D. Fla. 1994)—cited by Everest, *see* Def.'s MSJ at 16—where the insured failed to install an ice rink for a hockey game, as a result of which a third party sued the insured *specifically* for "breach of contract due to improper installation of the rink," *Ice Sys.*, 847 F. Supp. at 948.

Thomas delayed or failed to perform any contract terms *at all.* Thomas may well have been performing on schedule and in accordance with the terms of its oral agreement when the thief arrived. And, without a delay or a failure to perform, *nothing* could've "arise[n] out" of that non-delay or non-performance—however "expansively" the Florida Supreme Court has interpreted that phrase.

Recognizing this problem, Everest tries to broaden the terms of Exclusion M, suggesting that the "the theft 'arises out of' *the contract* between Ainsworth and Thomas." Def.'s MSJ at 19 (emphasis added). It's true that, without the (alleged) oral contract, the Truck probably wouldn't have been at Thomas's warehouse in the first place. But Exclusion M doesn't bar claims for property damage that arise out of *a contract*—it excludes claims for property damage that arise out of the insured's *delay or failure* to perform the terms of a contract.[13] For all these reasons, we conclude that Exclusion M didn't relieve Everest of its duty to defend.

---

[13] Everest cites three other cases—all inapposite. In each—and unlike here—the third-party claimants asserted breach-of-contract claims and, thus, necessarily alleged specific facts about the breached contractual obligations.

In *New Hampshire Insurance Co. v. Hill*, 2012 WL 3685500 (S.D. Ala. Aug. 23, 2012), *aff'd*, 516 F. App'x 803 (11th Cir. 2013), the insured promised to pay off the balances of purchasers' car loans when they traded in their vehicles, but the insured "deposited into its own operating account the funds intended to pay off the loans and used those funds for operating expenses," *id.* at *1. In holding that Exclusion M barred coverage, the court held that "it [was] unreasonable to suggest that this exclusion [did] not apply when [the purchasers'] claims stem from the failure of [the insured] to perform contractual obligations to satisfy the liens on the traded-in [vehicles]." *Id.* at *7. And, the court noted, the purchasers (who were suing the insurer) "d[id] not even attempt an argument to the contrary." *Id.*

In *M Consulting & Export, LLC v. Travelers Casualty Insurance Co. of America*, 2 F. Supp. 3d 730 (D. Md. 2014), the court applied Maryland law and held that Exclusion M precluded the claim. Again, however, the third-party claimant had alleged that the insured breached the contract. *See id.* at 740 ("[D]espite Plaintiff's characterization of this action as one involving negligence, the loss for which Plaintiff seeks to recover is the result of [the insured] failing to perform under the contract.").

And, finally, in *Artisan & Truckers Casualty Co. v. Hanover Insurance Co.*, 126 F. Supp. 3d 998 (N.D. Ill. 2015) (applying Illinois law), the underlying complaint alleged that the insured failed to fulfill its *specific* contractual obligations, *see id.* at 1003 (noting that the complaint "state[d] that [the insured] entered into a Broker–Carrier Agreement," in which it "agreed to transport and deliver the backhoes," but ultimately "failed to do so"; thus, "the underlying complaint provides that damage . . . arose out of [the insured's] failure to perform in accordance with the terms of the Broker–Carrier Agreement" (cleaned up)).

B.    *CCC Exclusion*

We turn now to the CCC Exclusion, a vexing provision whose key terms—"care," "custody," and "control"—the Policy never defines. For that reason, many courts around the country have suggested that the exclusion is *inherently* ambiguous,[14] and at least a few Florida courts have hinted as much—though they've never explicitly *held* that it is. *See Childtime Child Care, Inc. v. Colony Ins. Co.*, 946 So. 2d 1205, 1207 (Fla. 1st DCA 2006) ("Initially, we note that [the CCC Exclusion is] generally considered ambiguous." (citing *Mich. Mutual Liab. Co. v. Mattox*, 173 So. 2d 754, 757 (Fla. 1st DCA 1965))); *cf. Essex Ins. v. Rodgers Bros. Servs.*, 2007 WL 2298356, at *3 (M.D. Fla. Aug. 7, 2007) ("Under Florida law, care, custody or control provisions are generally considered ambiguous, and are, thus, construed even more strictly against the insurer than other provisions."). So, rather than try to construe this awkward provision, we'll begin with the *factual* allegations of the Underlying Complaint. This will allow us to sidestep some of the more difficult interpretative questions because, as we'll see, there are plausible readings of the underlying allegations that plainly fall *outside* the boundaries of the CCC Exclusion—*wherever* those boundaries might be.

As a brief recap, Ainsworth alleged that (1) it entered into a verbal agreement with Thomas to fix the concrete pump, (2) "the concrete pump . . . was delivered to [Thomas's] Tampa area business facility," and (3) "[u]nbeknownst to Ainsworth . . . the concrete pump was left by [Thomas] on a street outside of Thomas's business facility, and unsecured." Underlying Complaint ¶¶ 4–5. Armed with these averments, Ainsworth advanced two causes of action: negligence and negligent bailment. In the former, it claimed that Thomas "breached its duty to [Ainsworth] to safeguard [the] concrete pump."

---

[14] 9 COUCH ON INSURANCE § 126:20 (June 2021 Update) ("There is significant disagreement over whether the phrase 'care, custody, and control' is ambiguous. Several courts have held that there is no ambiguity in the phrase and that, therefore, there is no need to interpret it to mean anything other than what it says. There is also considerable authority that the phrase is fraught with ambiguity, and hence, the ambiguity would be resolved in favor of coverage.").

*Id.* ¶ 10. In the latter, it maintained that Thomas had become, in effect, a repair-shop bailee. *Id.* ¶¶ 14–16.

A reasonable person reading this Underlying Complaint *could* understand the events to have unfolded as follows: Ainsworth entered into an oral agreement with Thomas to repair the Truck; it then dropped the Truck off (perhaps at an agreed-upon time and location), at which point Thomas accepted the Truck, took the keys, and moved it from the delivery location at the warehouse to the "unsecured" location, where it was ultimately stolen. It almost goes without saying—and Thomas doesn't suggest otherwise—that this version of events is *reasonable* and that it fits comfortably within the CCC Exclusion. *See generally* Pl.'s MSJ; Pl.'s MSJ Reply.

One reasonable interpretation, however, isn't enough for Everest to avoid its duty to defend. To invoke the CCC Exclusion, remember, Everest must show that its version of events is the *only* reasonable interpretation of the Underlying Complaint. *See Beaver*, 466 F.3d at 1296 (to rely on an exclusion, an insurer must show "that the allegations of the complaint are cast *solely and entirely* within the policy exclusion and are subject to no other reasonable interpretation" (emphasis added)). That's a problem for Everest because we can plausibly read Ainsworth's factual averments a different way. We might, for instance, read them as suggesting (1) that Thomas didn't accept delivery of the Truck and didn't move it anywhere, or (2) that it accepted delivery of the Truck but attempted to return it to Ainsworth by leaving it near the warehouse. The Underlying Complaint—written with a concision that would've made Hemingway blush—never explains whether any Ainsworth agent entered Thomas's shop to sign for the invoice after dropping off the Truck; it never addresses whether someone from Ainsworth called to let Thomas know that the Truck was outside; it never suggests that the parties had agreed in advance on a time and place for the drop-off (or for the pick-up after repairs); and it never actually says whether Thomas physically moved the Truck after Ainsworth arrived—just as it never tells us whether Thomas ever even began (or completed) the repairs. *See*

*generally* Underlying Complaint. All these crucial facts—and, perhaps, others—Ainsworth leaves to our imagination.

Everest argues that Thomas's alternative versions of events aren't fairly encompassed by the Underlying Complaint because the phrases "delivered to" and "left by" *must* mean that Thomas accepted delivery of the Truck and then physically moved it from Point A to Point B. *See* Def.'s MSJ at 10–12. We disagree. A person can "deliver" something without the intended recipient knowing about the delivery or without the recipient ever taking control of it. An Amazon employee, for example, would say that he had "delivered" a package by leaving it at the recipient's front door, even though no one was home. Indeed, our Amazon employee would be justified in saying that he'd "delivered" the package—*even* if the homeowners had been on vacation at the time and *even* if they had no idea that the package had arrived. That's because we can deliver things to *places*—not just to *people*. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "delivery" as "[t]he formal act of voluntarily transferring something; esp., the act of bringing goods, letters, etc. to a particular person *or place*" (emphasis added)); MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/deliver (defining "deliver" as "tak[ing] (something) to a person *or place*" and offering the following example: "[t]he package was delivered *to the office* this morning" (emphases added)). It's worth noting, too, that (according to Ainsworth's allegations) the Truck "was delivered to [Thomas's] Tampa area *business facility*." Underlying Complaint ¶ 4 (emphasis added). The Underlying Complaint itself, in other words, seems to indicate (or at least leave open the possibility) that the Ainsworth driver dropped the Truck off at a *place*—without ever entering the warehouse or meeting with a Thomas employee.

In much the same way, a delivered item can be "left by" the recipient without the recipient knowing about the delivery. Suppose a person buys a rug for his friend. Suppose, too, that our buyer is in a rush and doesn't have time to go into his friend's house to hand-deliver the rug. So, imagine

that he tosses the rug over the gate at the front of his friend's home. Suppose, lastly, that our buyer then calls his friend to let him know about the delivery—but that the friend never picks up his phone and never learns that the rug is outside. If rain later damages the rug, our gift giver—in a subsequent dispute—might plausibly argue that it was his friend who "left" the rug outside. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2007) (defining "leave" as "[i]n *passive* without a sense of agency. *to be left*: to remain to be used or dealt with"). Or, in our Amazon hypothetical, the package recipient—having determined that the delivery was untimely—might've decided not to accept it. In that case, the recipient might say that he "left" the package on the street—as a way of indicating his rejection. *See id.* (defining "leave" as "to abstain from taking, consuming, removing, or dealing with" or "[t]o refrain from taking, dealing with, or doing (something) so that another person or agent can do so without interference; to allow to be controlled, done, or decided by another instead of oneself"). In either scenario, in short, an average, English-speaking observer might reasonably conclude that the rug and package were never in the "care, custody or control" of the intended recipients.

Trying to cabin the scope of the Underlying Complaint, Everest contends that "this is not a situation where Ainsworth left the truck outside on the street" and maintains that, per Ainsworth's allegations, Thomas had "clear-cut responsibilities . . . to look after the truck while at its facility." Def.'s MSJ at 10. But neither assertion finds any support in the document. The Underlying Complaint says nothing about *where* exactly the Truck was delivered or *what* happened when Ainsworth arrived. It also says nothing about the terms of any verbal agreement. At one point, Everest also edits words from the Underlying Complaint to make it appear as though Ainsworth delivered the Truck "'according[ ]' to the terms of its agreement." *Id.* If true, that allegation might strengthen the inference that Thomas knew (or should have known) the delivery time, date, and location. But the Underlying Complaint doesn't say anything like that.[15] To the contrary, the Underlying Complaint avers only that

---

[15] Note, in this respect, Everest's clever use of brackets.

"Ainsworth and Thomas entered into a verbal agreement whereby Thomas agreed to make repairs to a concrete pump" and, "*[a]ccordingly*, the concrete pump . . . was delivered to the Defendant's Tampa area business facility." Underlying Complaint ¶ 4 (emphasis added). The word "accordingly"—much different than "according *to*"—doesn't do the work Everest demands of it. It establishes, at most, that Ainsworth delivered the Truck to Thomas's facility *because* it had a contract for repairs—not that Ainsworth delivered the Truck *pursuant to* the specific terms of a contract (*e.g.*, an agreed-upon delivery time or place).

Everest also asks a more legalistic question: if Thomas hadn't accepted delivery of the Truck— or had, in fact, returned it—then how could Ainsworth have sued Thomas for negligently breaching its "duty to safeguard the pump?" Put another way, if Thomas had a so-called "duty to safeguard" the Truck, it must be because the Truck was in Thomas's care, custody, or control. *See* Def.'s MSJ at 13 (arguing that "the 'duty to safeguard' establishes that the truck was in Thomas'[s] 'care' and 'custody'"). This is an important point because, while courts often reiterate that the duty to defend is determined solely from the *factual* allegations of the underlying complaint, *see, e.g.*, *S.-Owners Ins. Co. v. MAC Contractors of Fla., LLC*, 768 F. App'x 970, 971 (11th Cir. 2019) ("Under Florida law, an insurer's duty to defend . . . depends solely on the factual allegations in the complaint."), the Eleventh Circuit has also explained that courts must interpret those factual allegations within the context of the *legal theories* the underlying complaint has advanced, *see Jones Boat Yard, Inc. v. St. Paul Fire & Marine Ins. Co.*, 745 F. App'x 308, 312 (11th Cir. 2018) ("[The appellant] contends on appeal that the duty to defend depends solely on the *factual* allegations of the complaint, to the exclusion of any causes of action or legal theories that might also be alleged. We disagree. Nothing in the Florida Supreme Court's statement that the duty to defend depends on a complaint's allegations indicates a desire to limit consideration to the complaint's *factual* allegations."). Even if we *could* read certain otherwise-plausible scenarios into

a complaint's factual averments, in other words, we shouldn't accept those scenarios as *reasonable* if they're inconsistent with the complaint's *legal* claims.

And that's a problem for Everest because, when we read the Underlying Complaint's factual allegations *together* with its legal theories, we find (again) that the CCC Exclusion doesn't *necessarily* apply. Everest, of course, is right to say that the "duty to safeguard" *can* trigger the CCC Exclusion—if one assumes that Thomas's duty arose because it took the Truck within its "care, custody or control." But, as we've said, that's not the *only* reasonable inference we can draw. Recall that the Underlying Complaint includes two counts—one for negligence and one for negligent bailment. The second count is based on the theory that Thomas "had sole, actual and exclusive possession and control of Ainsworth's concrete pump prior to the theft." Underlying Complaint ¶ 14. That theory, as Everest points out, fits perfectly within the CCC Exclusion. *See* Def.'s MSJ at 12 ("Ainsworth's allegations of a bailment fall squarely within Exclusion."). The first count, however, is silent about what *exactly* triggered Thomas's "duty to safeguard." *See generally* Underlying Complaint. And—here's the key point—it wouldn't make sense for *that* duty to have *likewise* arisen from Thomas's possession or control of the Truck because any such reading would render this first count entirely duplicative (and, thus, superfluous).

The negligence count, in other words, must be doing some *additional* work for Ainsworth—*i.e.*, it must be expanding Thomas's potential liability *beyond* the scope of what the bailment theory provides. How might it do this? Well, we can think of several ways. *For one thing*, this count may be alleging that, *even if* Thomas didn't accept delivery of the Truck, Thomas was still negligent in (mis)communicating to Ainsworth the drop-off time and place. *Or* it could be saying that Thomas had faulty intake procedures at its shop and insufficient security on its premises. *Or* it may be claiming that Thomas negligently designed its warehouse parking area in a way that invited customers (or potential

customers) to leave their vehicles in unsecured locations. Each of these legal theories would harmonize the negligence and negligent-bailment counts—thereby ensuring that neither is superfluous.

Everest has a few responses to this—all unpersuasive. *First*, it suggests that the bailment claim depends on Thomas having had "exclusive" control of the Truck (a necessary element of bailment), whereas the CCC Exclusion doesn't require exclusive control. *See* Def.'s MSJ at 14. Here, again, Everest misses the point. Our job is to interpret the Underlying Complaint holistically and sensibly. If Thomas had accepted delivery of the Truck, as Everest suggests, then it would have become a repair-shop bailee. *See* 38 AM. JUR. 2D GARAGES, ETC. § 17 ("[A] bailment is created where a person has turned possession of a car to the care and custody of a garage operator or parking lot owner. . . . The scope of the bailor-bailee relationship is, however, subject to the reasonable and foreseeable expectations of the parties."). In that scenario, as we've outlined, the negligent-bailment count would be the only viable count—a result that would render the negligence count entirely unnecessary. Again, the Underlying Complaint only makes sense if the negligence count encompasses some *other* factual scenario—a scenario in which Thomas was still negligent, even though it *didn't* become a bailee. And it's this *other* scenario that pushes the case beyond the bounds of the CCC Exclusion.

*Second*, Everest claims that Thomas's "duty to safeguard" was contractual. *See* Def.'s MSJ at 13 (arguing that "the specific 'charge' Thomas was required to 'guard' was Ainsworth's truck, by virtue of the agreement with Ainsworth"). But, again, this argument finds no support in the Underlying Complaint. Count I *doesn't* allege the breach of any contract, and it *doesn't* include any of the elements of a breach-of-contract claim. What it does include are the elements of a common-law negligence cause of action—duty, breach, causation, damages. Indeed, the very phrase "duty to safeguard" denotes a tort, not a contract.

*Third*, Everest argues that the terms of the CCC Exclusion are coextensive with a common-law "duty to safeguard." *See* Def.'s MSJ at 13–14. But none of the cases Everest cites support the

proposition that a person has a "duty to safeguard" property *only* when the property is in the person's care, custody, or control. Indeed, all three cases differ from ours in salient ways. In *Nationwide Insurance Co. v. Central Laborers' Pension Fund*, 704 F.3d 522, 524 (7th Cir. 2013), for instance, an employee of an accounting firm left a disc—which had client information stored on it—in her laptop, and the laptop was later stolen from her car. After the client sued the firm in state court, the firm's insurer sought a declaration that it didn't have a duty to defend. *Id.* Relying on the CCC Exclusion, the Seventh Circuit affirmed the district court's ruling in favor of the insurer. *Id.* at 528. But, in that case, the firm's duty to safeguard arose from its *contractual* obligation. *See id.* at 524 ("[T]he Firm agreed in writing to ensure that its employees and agents would safeguard the information on the compact disc. Thus, [the employee], who came into possession of the compact disc, had a duty to safeguard the confidential information on the disc as a condition of her employment."). And, in any event, there wasn't any dispute—as there is here—over whether the employee had actually taken the disc into her possession. *Id.*

Similarly, in *Liberty Mutual Insurance Co. v. Zurich Insurance Co.*, 930 N.E.2d 573 (Ill. App. Ct. 2010), the court held that the CCC Exclusion relieved an insurer of its duty to defend its insured (a hotel) in a lawsuit brought by a guest whose property was stolen from a hotel room. But that case dealt with the specialized duty of care that applies to innkeepers. *See id.* at 577 ("The innkeeper has duties similar to those involved in a bailment with respect to property brought onto the innkeeper's premises. . . . Case law supports a finding that the guest's property falls within the control of the hotel."). The case thus *didn't* hold that the "care, custody or control" exclusion was coextensive with the duty to safeguard in the context of any *other* kind of business establishment. Indeed, the court's analogy to a bailment theory lends further support to our point that, if Thomas *had* accepted delivery of the Truck, Ainsworth would've only needed a bailment count. And, whereas there was no dispute in *Zurich* that the property had been stolen *from the hotel room*, our Underlying Complaint doesn't

22

definitively establish that the Truck was *on* (rather than in front of) Thomas's premises when it was stolen. *See generally* Underlying Complaint.

Finally, in *Cincinnati Insurance Co. v. Berkshire Refrigerated Warehousing, LLC*, 2017 WL 3642024 (N.D. Ill. Aug. 24, 2017), a customer sued an insured storage company, alleging that its "equipment went missing while it was kept in [ ] trailers provided by [the storage company]," and that the storage company "moved these trailers to another location unbeknownst to [the customer]," *id.* at *8. The court held that the CCC Exclusion precluded coverage for the claim. *Id.* at *8–9. But the underlying complaint in that case made clear that the stolen goods were *in the insured's possession* by alleging that the insured had put the claimant's goods in its trailers and then moved those trailers to a different location. *Id.* In our case, by contrast, the Underlying Complaint *doesn't* say *either* that Thomas accepted the Truck onto its premises *or* that it drove the Truck anywhere else.

In any event, as we've said, the negligence count in the Underlying Complaint really makes sense *only* if it encompasses scenarios in which there wasn't a clean hand-off between Ainsworth and Thomas—that is, only scenarios in which Thomas *didn't* become a repair-shop bailee. Now, we're not saying that any one of the alternative negligence theories we've ascribed to Count I would have succeeded. We can't say, for example, that Ainsworth would've prevailed on its claim that Thomas's negligent intake procedures breached some "duty to safeguard" property that, because of those faulty procedures, was left unsecured. But Everest's duty to defend doesn't hinge on the *merits* of the facts or legal theories Ainsworth advanced, and it's not our job to predict the outcome of the underlying litigation. *See Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.*, 344 F. Supp. 2d 1358, 1365 (M.D. Fla. 2004), *aff'd sub nom. Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.*, 171 F. App'x 831 (11th Cir. 2006) ("The insurer's duty to defend is not affected by the merits of the third party's claim or the likelihood that the claim will ultimately be successful; an insured is entitled to a defense by its insurer against even the most frivolous suit, so long as it describes an occurrence within coverage."); *State Farm Fire*

*& Cas. Co. v. Tippett*, 864 So. 2d 31, 33 (Fla. 4th DCA 2003) ("[T]he insurer has a duty to defend even if the facts alleged are false or the legal theories unsound."). Our job, instead, is to determine whether there are some *reasonable* interpretations of the Underlying Complaint that fall outside the CCC Exclusion. Because there are, Everest had a duty to defend. *See Beaver*, 466 F.3d at 1296 (to rely on an exclusion, an insurer must show "that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation").

With that issued settled, we turn our attention to interpreting the CCC Exclusion. As we've said, many courts have found the clause inherently ambiguous, and at least a few Florida courts have suggested as much. But, even if the clause isn't inherently ambiguous, it's still an insurance *exclusion*, which means that it should be construed (very) strictly against the insurer—that is, construed even *more* strictly than we'd typically construe a standard coverage provision. *See Anderson*, 756 So. 2d at 34 ("In fact, exclusionary clauses are construed even more strictly against the insurer than coverage clauses." (citing *State Comprehensive Health Ass'n v. Carmichael*, 706 So. 2d 319, 320 (Fla. 4th DCA 1997))). In other words, Everest bears the burden of *proving* that the CCC Exclusion *necessarily* subsumes *all* the plausible facts and *all* the plausible legal theories in the Underlying Complaint. Everest has failed to meet this heavy burden here.

Everest's most compelling argument is that, with respect to auto-repair shops, "the Florida Supreme Court observed that a care, custody, or control exclusion applied to damage to a customer's vehicle when left with the insured." Def.'s MSJ at 6. But Everest overstates the value of the two cases it cites.

The first case, *Haenal v. U.S. Fidelity & Guarantee Co. of Baltimore, Md.*, 88 So. 2d 888 (Fla. 1956), didn't even implicate a CCC Exclusion. Instead, *Haenal* involved a special type of commercial policy— a garage liability policy—with a *different* kind of exclusion for "property in charge of or transported by the Insured." *Id.* at 889. In interpreting *that* provision, the Florida Supreme Court observed "that

24

customers' cars, while being serviced or repaired, are 'in charge of' the insured within the meaning of such an exclusion clause." *Id.* at 889–90. Our CCC Exclusion, of course, doesn't include that same phrase—"in charge of"—and there's no reason to believe that the two phrases mean the same thing. CCC Exclusions, after all, have appeared, for years, in thousands of insurance policies across the country. And so, an insurance company that, in the face of this widespread use, opted for a different term of art must have intended to impart some different meaning. Even if the two exclusions could be analogized, though, *Haenal* would remain inapposite here. In that case, remember, there wasn't any doubt that the car was being serviced *in* the insured's shop when it was damaged. *Id.* at 888 ("The trial judge held that the insurance policy did not cover the loss by fire of a customer's car while it was in Haenal's shop for repairs."). *Haenal* thus had nothing to say about a case like ours—where the Underlying Complaint leaves open the very real possibility that the Truck was *not* on Thomas's premises when it was stolen. And, as we've explained, if the Truck was not on Thomas's property when it was swiped, then Thomas may not have been "in charge of" the Truck—just as the Truck might not have been in Thomas's "care, custody or control."

In the second case, *Certain British Underwriters at Lloyds of London, England v. Jet Charter Service, Inc.*, 789 F.2d 1534 (11th Cir. 1986), the facts were undisputed that the insured was *actively* repairing the damaged property—an airplane—at the time of the accident, *id.* at 1535 ("The aircraft slipped off its jacks during a weight and balance check and sustained severe structural damage."). Also, the issue in *Jet Charter* was, not the scope of the terms "care, custody or control," but the application of an *exception* to the CCC Exclusion, which provided that the exclusion "shall be deemed not to apply to vehicles that are not the property of the Assured whilst on the premises." *Id.* at 1536. The insured, in other words, agreed that the aircraft *was* in its care, custody, and control—but insisted that the aircraft was the kind of "vehicle" the exception exempted from the exclusion. *Id.* ("[The insured] argue[s] that

the exclusion does not apply to aircraft not the property of [the insured] but on its premises and under its care, custody or control."). Neither case, in sum, helps Everest much here.

Everest also offers a textual argument. It says that each term in the CCC Exclusion should be given separate and independent meaning. *See* Def.'s MSJ at 8. The term "care," in other words, must (in Everest's view) mean something *other than* "custody" and "control." What exactly? Well, Everest surmises that, at the very least, "care" must cover situations in which the property *wasn't* in "the insured's *physical* possession at the time [ ] the damage occur[red]." *Id.* (emphasis added). But, even accepting *both* Everest's interpretative methodology *and* its definition of "care"—"the 'process of protecting' something, including 'supervision,' 'charge,' or 'temporary keeping . . . for the benefit of or until claimed by the owner,'" *id.*—the Underlying Complaint *still* doesn't establish that the Truck was in Thomas's "care." If Thomas didn't know that the Truck had been delivered, *or* if Thomas didn't accept delivery, *or* if Thomas had tried to return the Truck to Ainsworth—*all* possibilities the Underlying Complaint leaves open—then the Truck wouldn't have been under Thomas's "supervision," "charge," or "temporary keeping."

We should add, too, that Everest's interpretive methodology may not be appropriate for the CCC Exclusion. While some courts do give each of the three words independent and distinct meaning, others treat the phrase as a single term of art with one specialized meaning. *Compare Valley Forge Ins. Co. v. Field*, 670 F.3d 93, 99 (1st Cir. 2012) ("The term 'care' must be given a meaning and effect apart from the term 'custody' and the term 'control.' The three words are connected by the disjunctive 'or,' signalling they are to be read separately."), *with Tifton Mach. Works, Inc. v. Colony Ins. Co.*, 480 S.E.2d 37, 39 (Ga. Ct. App. 1996) ("The 'care, custody or control' language at issue is a term of art whose meaning varies depending on the underlying type of risk being insured. The cases applying this language may be viewed on a continuum. . . . Our courts also consider the purpose of the 'care, custody or control' language, which in the instant case, as in so many borderline cases, is to avoid a guarantee of

workmanship."); *cf. United States v. Obando*, 891 F.3d 929, 934 (11th Cir. 2018) ("[T]he ordinary meaning of a term will yield when the term has 'a technical meaning' or is a 'term of art.'" (cleaned up) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 73 (2012))). And, while Florida's courts haven't explicitly adopted one interpretive methodology over the other, they seem to favor the *latter*.

So, for instance, in *Childtime*, a daycare center hired a carpet-cleaning company to wash its carpets on the weekends—while the center was closed. 946 So. 2d at 1206. To facilitate one such cleaning, the cleaning company's employees moved the center's furniture outside, where it was later damaged by rain. *See id.* After the center sued the cleaner in state court, the cleaner settled the lawsuit and assigned to the center its indemnity claim against its insurer. *Id.* at 1207. Armed with this assignment, the center then sued the insurer, which (pointing to the policy's CCC Exclusion) refused to indemnify. *Id.* At his deposition, the center's director testified that the cleaner was neither instructed nor expected to move the furniture outdoors. *See id.* at 1206. Based in large part on this testimony, the trial court granted the insurer's motion for summary judgment, finding that the furniture was in the cleaner's "care, custody or control" when the rain started. *Id.* at 1207.

The First DCA reversed—though not based on a plain-text reading of *each* word in the CCC Exclusion. *Id.* Instead, the court explained that the *purpose* of the exclusion was "to remove the inducement for the insured to submit exaggerated or false claims and avoid the guarantee of workmanship." *Id.* According to the DCA, "in situations where title to the property remains in other persons, and the insured is neither renting nor actively using the property at the time of its damage," there's less of an incentive to commit fraud. *Id.* The carpet cleaner didn't have an incentive to submit a fraudulent claim based on faulty workmanship because, in the court's view, the cleaner's "temporary possession of personal property owned by [the center] for the purpose of moving that property from the area to be cleaned" couldn't "be described [as] an essential element of the work." *Id.*

If the CCC Exclusion didn't bar coverage for the cleaner in *Childtime*, it's hard to see how it does so here. The cleaning company undoubtedly moved the center's furniture outside, and it did so on a weekend—when the center's employees weren't present—and without the center's knowledge. Here, by contrast, we don't know whether Thomas even knew that the Truck was on its property, whether it accepted delivery, or whether it physically moved the Truck from Point A to Point B. There thus wasn't any incentive for Thomas to submit a fraudulent claim to mask its poor workmanship. Indeed, even if Thomas *had* moved the Truck to another location on its premises, as Everest suggests that it did, then that act—like the carpet cleaner's act of moving furniture outside—would've been purely incidental to Thomas's pump-repair work. Under *Childtime*, then, the CCC Exclusion *still* wouldn't apply because moving the Truck wasn't an "essential element of the work" that Thomas was hired to perform. *Childtime*, 946 So. 2d at 1207.

Ultimately, our job isn't to choose the appropriate interpretative method, but to faithfully apply Florida law, which—as *Childtime* makes pellucid—follows (at least in this context) a more purposive approach. *See generally id.*; *see also* 31 FLA. JUR. 2D INSURANCE § 2600 (Sept. 2021 Update) ("The 'care, custody, or control' provision of a comprehensive liability policy is aimed at eliminating coverage when the insured is closely related to some type of work-related situation where the insured is exercising some sort of control over the property subsequently damaged and to remove the inducement for the insured to submit exaggerated or false claims and avoid the guarantee of workmanship. Where the damage is to property belonging solely to others, the care, custody, or control exclusion seeks to deter an insured from making its insurer a guarantor of its workmanship.").

Along the same lines, in fact, Florida courts have held that the application of the CCC Exclusion depends "upon many . . . *facts*, such as the location, size, shape and other characteristics of the property, what the insured is doing to it and how, and the interest in and relation of the insured and others to it." *Glens Falls Ins. Co. v. Fields*, 181 So. 2d 187, 189 (Fla. 1st DCA 1965) (emphasis added

& cleaned up). Because the Underlying Complaint includes very few *facts*, it leaves us to speculate about the answers to many of those questions—like, for instance, what (if anything) Thomas was doing with the Truck when it was taken. And Everest hasn't pointed us to any cases with similar facts—cases from which we might *necessarily* infer that the relevant variables in our case (a large pump truck, a theft, etc.) trigger the CCC Exclusion.

The issues in this case are undoubtedly complex. The CCC Exclusion has proven difficult to construe and apply, and the Underlying Complaint is unfortunately vague and open-ended. But Everest has a very heavy burden to show that Ainsworth's allegations bring the "case solely and entirely" within the ambit of the CCC Exclusion. *See Beaver*, 466 F.3d at 1296. And (both sides agree) we must resolve any reasonable doubts about the meaning of the Underlying Complaint's allegations in Thomas's favor. *See Miranda Constr. Dev., Inc.*, 763 F. Supp. 2d at 1339. Finding at least some daylight between the Underlying Complaint and the CCC Exclusion, we conclude that Everest had a duty to defend Thomas against Ainsworth's suit.

*** 

We, therefore, **ORDER and ADJUDGE** as follows:

1. The Pl.'s MSJ [ECF No. 48] is **GRANTED**. The Defendant, Everest National Insurance Co., had a duty to defend Thomas Machinery, Inc., in the underlying lawsuit. The Plaintiff, Thomas Machinery, Inc., is thus entitled to partial summary judgment as to Count I of its Amended Complaint.

2. The Def.'s MSJ [ECF No. 56] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 23rd day of November 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record